Civ. No. 11-1986 (GAG)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

---

**VANESSA MARRERO-SERRANO, et al.,**

**Plaintiffs,**

**v.**                                                                    **Civ. No. 11-1986 (GAG)**

**FACE BANK INTERNATIONAL CORP.,**

**Defendant.**

---

## OPINION AND ORDER

Vanessa Marrero-Serrano ("Marrero" or "Plaintiff") and the conjugal partnership between her and Ruben Fuentes Ayala sued Face Bank International Corporation ("Face Bank" or "Defendant") for violations of Title VII, 42 U.S.C. §§ 2000*e et seq.*; the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* ("BSA"); the PATRIOT Act; Puerto Rico Law No. 115, P.R. LAWS ANN. tit. 29, §§ 194 *et seq.*; Puerto Rico Law No. 80, P.R. LAWS ANN. tit. 29, §§ 185a *et seq.*, and; Article 1802, P.R. LAWS ANN. tit. 31, § 5141. Defendant moved to summarily dismiss at Docket No. 47. For the following reasons, the court **GRANTS** the motion for summary judgment at Docket No. 47.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of

**Civ. No. 11-1986 (GAG)**

either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

2

Civ. No. 11-1986 (GAG)

## II.      RELEVANT FACTUAL BACKGROUND

Plaintiff began working for Defendant on March 1, 2010, as a compliance officer. (Docket No. 47-30 at 1.)   She held many responsibilities and the nature of her job required oversight of compliance with the Bank Secrecy Act, the PATRIOT Act, and Anti-Money Laundering laws.[1]   (Docket No. 61-8 at 1.)

Julio Carbonell, Defendant's general manager, was some form of a supervisor (though not Plaintiff's, by his own admission) and an intermediary between Plaintiff and Defendant's compliance committee.   (Docket Nos. 47-30 at 2; 47-3 at 4; 51 at 3.)   On December 9, 2010, Carbonell could not reach Plaintiff when he needed answers to compliance questions and Plaintiff and another employee received an email from Carbonell alleging that they had failed to comply with their work schedules by leaving their work area unattended during the lunch hour.   (Docket No. 47-30 at 3.)   Plaintiff claims she was entitled to go out to lunch because she was a manager and that she let Carbonell know that the incident would not reoccur.   (Docket Nos. 51 at 4; 47-4 at 1-2.) Although Plaintiff's statement of facts states that Carbonell never called Plaintiff or attempted to reach her, she acknowledges receiving an email.   (Docket No. 47-4 at 1-2.)

On January 18, 2011, Carlos Pan ("Pan") sent an email to Plaintiff informing her that she committed numerous errors, omissions, and confusion in a Spanish-English translation during a BSA seminar Plaintiff organized, and that she failed to perform adequate quality control.   (Docket No. 47-30 at 4.)   Plaintiff responds that the compliance

---

[1] Plaintiff contests Defendant's description of Plaintiff's job responsibilities, yet she cites the job description that Defendant provides as an accurate recitation of Plaintiff's job responsibilities.   Because Defendant submitted this document as corroborating evidence and Plaintiff cites it favorably, the court will draw from it, when necessary, to discuss Plaintiff's job responsibilities.   (See Docket No. 61-8.)

Civ. No. 11-1986 (GAG)

committee organized the seminar and that Pan simply addressed his concerns to her. (Docket No. 51 at 6.)

On February 9, 2011, Plaintiff sent an incorrect opinion to external audits regarding bank fraud, a claim which Plaintiff refutes by calling to question whether an "opinion," by definition, can be incorrect.  (Docket Nos. 47-30 at 4; 51 at 6.)

On February 15, 2011, Plaintiff was verbally warned for using the company's internet for her personal use to listen to the radio during working hours.  She concedes that this occurred.  (Docket Nos. 47-30 at 5; 51 at 6.)

On February 24, 2011, Plaintiff received a written warning from Carbonell because she delayed returning incoming transfers, which ostensibly made clients complain.  (Docket No. 47-30 at 5.)  Plaintiff responds that she did not violate any company policy; rather, Carbonell was merely expressing his opinion.  (Docket No. 51 at 6.)  The email provides a lengthy description of why Carbonell believed Plaintiff performed her responsibilities unsatisfactorily.  (Docket No. 61-5 at 4-5.)

On March 3, 2011, Defendant's compliance committee evaluated Plaintiff and awarded her a score of 50 out of 100, calling to question Plaintiff's understanding of the company's endeavors, ability to follow instructions, ability to analyze complex problems or situations, decision-making, creativity and initiative, and enthusiasm, which Defendant claims Marrero signed.  (See generally Docket Nos. 47-30 at 5; 61-6.)  Plaintiff responds that she never knew about the evaluation and that she did not sign it, although the document contains a signature.  (Docket Nos. 51 at 7; 47-16 at 6.)

Defendant argues, "Days before her termination, Plaintiff opened a mutual fund called 'The Dominion Fund,' an account [in] clear violation of [Defendant's] policy[,

Civ. No. 11-1986 (GAG)

which] created immense liability for [Defendant]." (Docket No. 47-30 at 6.) Plaintiff replies that she "stated that the procedure to open an account was to analyze the information sheet provided by the Business Development Facilitator disregarding the business['s] name, and that the ultimate decision to open or close an account was at the discretion of the [c]ompliance [c]ommittee or Carbonell's individual opinion." (Docket No. 51 at 8.) Plaintiff cites Carbonell's deposition testimony to substantiate her position but fails to elaborate on why this testimony adequately counters Defendant's assertion. (See Docket Nos. 51-10-51-11.)

Defendant also offered Plaintiff training to become a licensed money laundering specialist, but Plaintiff declined to obtain the license and states that the license was required neither for her job nor by her employer. The parties dispute whether Defendant offered to pay for the license. (See Docket Nos. 47-30 at 6-7; 51 at 8.)

Defendant, laying on the allegations, asserts that Plaintiff discussed confidential bank information with third parties, namely Giselle Alba and Roberto Onorato, a facilitator. (Docket No. 47-30 at 7.) To substantiate its claim, Defendant cites its evaluation of Plaintiff and Carbonell's deposition testimony. (Id.) The evaluation states, "The employee has discussed internal situations with a Business Facilitator specifically related to the acquisition of a trend analysis tool and BSA management ("Assist"). This discussion has shown lack of criterion and maturity which is expected of a manager." (Docket No. 61-6 at 6.) The evaluation goes on to say, "The employee has discussed movements of accounts of other employees with third level personnel in charge of customer service. This violates the banking secrecy policy . . . ." (Id.) Defendant based the evaluation on Carbonell's testimony, but Carbonell withdrew the allegation that the

5

Civ. No. 11-1986 (GAG)

disclosure to Onorato was a violation, and he stated that he did not know whether Plaintiff was merely doing her job when she disclosed information to Alba.  (See Docket No. 47-22 at 1-2.)

Defendant avers that Plaintiff misinformed external auditors about the bank's role.  (Docket No. 47-30 at 7.)  Carbonell's deposition testimony indicates that Plaintiff told an auditor that the bank worked with deposit brokers and failed to identify the customers who opened accounts, which could be a violation.  (See Docket No. 47-23 at 2.)  Plaintiff counters that the cited exhibits do not imply she misinformed the auditors, instead claiming they show "her concern and investigation of 'business facilitators,' based overseas, recommending clients without doing due diligence, and at the same time being 28% of the stockholders of the bank."  (Docket No. 51 at 9.)

Lastly, Defendant accuses Plaintiff of failing to provide the Secretary of the Treasury or any federal agency with any information regarding violations of banking laws.  (Docket No. 47-30 at 7.)  During her deposition, Plaintiff was asked, "In the course of your employment with [Defendant], did you ever provide any information to the Secretary of the Treasury Department of the United States about any possible violation of the law or regulations by [Defendant]?" to which she replied, "No . . . ." and that she reported events to a person named Vincent through electronic communication.  (Docket No. 47-24 at 1-2.)   When asked whether any suspicious activity reports she filed implicated the bank or a bank employee as violating any laws or regulations, Plaintiff replied, "No."  (Id. at 2.)

Plaintiff contends that she reported record numbers of suspicious activity reports to the federal government, the Commissioner of Financial Institutions, and the IRS.

Civ. No. 11-1986 (GAG)

(Docket No. 51 at 9.)  To support her assertion, she cites part of her complaint as record evidence, which is unacceptable and will not be considered.  She also cites her deposition to support the proposition that she disclosed information to the IRS.  (Id.)  The portion she cites, however, contradicts her claim.  When asked, "Did you go to meet [the IRS] for the purpose of reporting any violation of the law or regulations by [Defendant] or any of its employees," she replied, "No.  I went there pertaining to offering of the seminar in order to provide guidance to [Defendant's] employees."  (Docket No. 51-15 at 2.)

On March 8, 2011, Defendant terminated Plaintiff.  (See Docket Nos. 47-30 at 8; 51 at 10.)  Defendant references "exhibits 3 through 9" to its statement of facts as evidencing the written and oral warnings Plaintiff received.  (Docket No. 47-30 at 3.) Exhibit 3 is Plaintiff's deposition testimony during which she stated that there was no compliance committee when she began working for Defendant and that one was formed after she began her tenure.  Exhibit 4 is another portion of Plaintiff's deposition.  She states she received an email warning her that she failed to comply with an internal company policy and that the failure would not occur again.  (Docket No. 47-4 at 1-2.)  A copy of the email exchange is found at Docket No. 61-1.  Exhibit 5 is a discussion of the email, which is unnecessary because the email speaks for itself.  (Docket No. 47-5.)  The importance of Exhibit 6 is not discernible and Defendant does not elaborate on why this particular exhibit supports its position.  (Docket No. 47-6.)  Exhibit 7 is another Carbonell excerpt in which he states, "Any document sent to the employee that discusses an incident, we consider it a review of some sort."  (Docket No. 47-7 at 2.)

Exhibit 8 is an excerpt of Plaintiff's deposition in which Plaintiff states she received an email from Carbonell that explained his opinion regarding the closing of a

Civ. No. 11-1986 (GAG)

particular account, and Exhibit 9 is a copy of Carbonell's email in which he states, "[O]ur investigation was deficient and . . . we must analyze our process to understand why this conclusion was not reached before involving management.  We have looked horribly with the client."  (Docket Nos. 47-8; 61-2 at 1.)  Plaintiff states she never closed the referenced account; rather, the compliance committee closed it due to suspicious activity, and that the email was addressed to the entire compliance committee.  (Docket No. 51 at 5.)  In fact, the email was addressed to multiple recipients.  (Docket No. 61-2 at 1.)

Plaintiff subsequently visited a mental health professional three or four times. (Id.) Defendant claims, "The mental health professional Plaintiffs visited . . . is the only person they saw for mental health issues related to this case, and in fact, had never sought mental health treatment before being terminated . . . ."  (Docket No. 47-30 at 8.)  Plaintiff classifies this statement of fact as "contested," yet, confusingly, she recites, verbatim, the statement of fact and the citation Defendant provides.  (See Docket No. 51 at 10.)  In any case, Plaintiff stated that this doctor was "the only person that [she] saw for any sort of psychiatric or psychology issues," and that she had never previously seen a psychiatrist or psychologist before being terminated.  (Docket No. 47-27 at 1-2.)  Furthermore, her husband never sought treatment prior to her termination and he testified that he was not given any diagnosis or medication from the doctor he visited subsequent to his wife's termination.  (Id. at 3; see also Docket No. 47-28 at 1.)  However, Plaintiff includes an exhibit titled "Psychodiagnostic Evaluation Report" on her husband that states he suffered from "few serious psychological problems."  (Docket No. 51-16 at 1.)

An EEOC investigator informed Plaintiff that the EEOC did not have jurisdiction because the retaliation claim was not rooted in allegations of discrimination.  (Docket

Civ. No. 11-1986 (GAG)

Nos. 47-30 at 2; 51 at 4.)  Aside from being dismissed, Plaintiff does not allege any other retaliatory actions taken against her.  (Docket Nos. 47-30 at 2; 51 at 3.)

The court reviewed the parties' motion for summary judgment and opposition and determined that they were not on the same page as to the federal laws under which Plaintiff sought relief.  The complaint states claims under the BSA, the PATRIOT Act, and Title VII.  However, Plaintiff's opposition to Defendant's motion for summary judgment neglected to oppose Defendant's motion to summarily dismiss those claims in any meaningful way and, instead, argued for relief under the False Claims Act ("FCA").

The court ordered the parties to consider whether they would voluntarily dismiss the BSA and PATRIOT Act claims, while the FCA claim would persist and Defendant would have an extension of time to move to summarily dismiss that claim.  The parties moved for such voluntary dismissal and included the Title VII claim, thereby dismissing all claims except the FCA claim.  (See Docket No. 70.)

The court then ordered Plaintiff to submit a list of citations of fact found in the record that substantiate her FCA claim.  (Docket No. 73.)  Plaintiff complied on February 4, 2014, listing 29 facts she believes entitle her to relief under the FCA.  (Docket No. 75.)  The first 14 facts cite the complaint.  (See Docket No. 75 at 1-4.)  Paragraphs 15 and 16 generally discuss the BSA and the function of compliance officers and suspicious activity reports, citing a BSA handbook and the parties' joint initial scheduling conference memorandum.  Paragraphs 17 through 21 cite the parties' joint initial scheduling conference memorandum, which is tantamount to a complaint.  Paragraphs 23 through 29 are simply restated facts or citations of exhibits attached to Plaintiff's opposition to summary judgment which have already been discussed.  (Docket No. 75 at 7-9.)

Civ. No. 11-1986 (GAG)

This leaves only Paragraph 22.  Paragraph 22 references Docket No. 61-14, in which Plaintiff sends an email to Joaquin Sole (Joaquin.sole@crowehorwarth.com) and Carbonell stating, "As requested, relating to the case of possible fraud with regard to the client, Vermer Touron for $116,972.00.  Attachment: Explanatory letter signed by the client and Notice of the issuing bank claiming the fraudulent transaction.  If you need additional data, we are at your disposition." (Docket No. 61-14 at 1.)  Carbonell replied to Plaintiff, "Who did you send this to[?]" to which she replied, "The Crow Harwart Accounting Firm asked me whether we had any case related to fraud . . . ."  (Id. at 1-2.)  Carbonell responded, "This is not true I'll call you," and proceeded to email Sole and Plaintiff, stating that the accounting firm need not consider the transaction as possibly fraudulent.  (Id.)

Interestingly, cursory Google searches of "Crowe Horwarth" (the spelling in the email address for Joaquin Sole) and "Crow Harwart" (Plaintiff's spelling in her email) yield a hit for the accounting firm of "Crowe Horwath."  The reason this is interesting is because these email exchanges were between someone at the domain name of "crowehorwarth," which makes the court wonder whether they were ever even received.

Defendant, with leave of court, moved to summarily dismiss the FCA claim.  (See Docket No. 78.)

## III.   DISCUSSION

The court begins by expressing some confusion about the laws under which Plaintiff seeks relief.  The complaint sought relief under Title VII, the BSA, and the PATRIOT Act.  However, the parties consented to voluntarily dismiss those claims. Plaintiff's opposition and sur-reply to Defendant's motion for summary judgment rely

Civ. No. 11-1986 (GAG)

solely upon the FCA and stated no meaningful legal argument for relief under the other laws.  It is clear, however, that this claim fails as a matter of law.  Furthermore, the first 21 of the 29 facts Plaintiff cites are from her complaint or the scheduling conference memorandum, which is simply a recitation of the complaint.  Relying on a complaint or a scheduling conference memorandum as evidence is improper and the court will not consider it. See First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256-257 (1998); Senra v. Town of Smithfield, 715 F.3d 34, 42-43 (1st Cir. 2013).

Before embarking on an analysis of the eight remaining facts, the court notes that this case was probably meant to be or probably should have been rooted in whistleblower protection laws.  Indeed, one of the cases Plaintiff cites to support its FCA claim, Lawson v. FMR LLC, 670 F.3d 61, 71 (1st Cir. 2012), discusses Sarbanes-Oxley in the context of whistleblower protection.

31 U.S.C. § 5328 prohibits discrimination against employees who provide information to any federal supervisory agency regarding a possible violation of any law or regulation.  Although Plaintiff fails to articulate a claim under this provision, and the court is not required to formulate one for her, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), all is not lost if Plaintiff believes her claim is meritorious.

The court asked the parties to consider whether they would voluntarily dismiss the BSA and PATRIOT Act claims because Plaintiff completely neglected to mount any meaningful legal argument supporting relief under those laws.  The parties voluntarily consented to dismissal of the BSA, PATRIOT Act, and Title VII claims pursuant to Rule 41(a)(1)(A)(ii).  (See Docket No. 70.)  "Unless the notice or stipulation states otherwise,

Civ. No. 11-1986 (GAG)

the dismissal is without prejudice." FED. R. CIV. P. 41(a)(1)(A)(ii). The notice does not state otherwise.

Plaintiff invoked the BSA and the BSA is codified at 31 U.S.C. § 5311. Section 5311 states, "It is the purpose of this subchapter . . . to require certain reports or records where they have a high degree of usefulness in criminal, tax or regulatory investigations or proceedings . . . ." 31 U.S.C. § 5311. The subchapter is titled "Subchapter II. Records and Reports on Monetary Instruments Transactions." Section 5328, the whistleblower protection section of Title 31, also falls under the auspices of Subchapter II. Therefore, the law Plaintiff referenced clearly encompasses the whistleblower protection section. Plaintiff may appropriately resubmit a motion seeking whistleblower protection under section 5328.

Proceeding to the FCA analysis, the court **DISMISSES** the claim. Plaintiff invokes 31 U.S.C. § 3730(h), which states, "Any employee . . . shall be entitled to all relief necessary to make that employee . . whole, if that employee . . . is discharged . . . because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter," which runs from 31 U.S.C. § 3721 to section 3129.

A cursory review of §§ 3721-3728 reveals that they are completely inapplicable to this case. Plaintiff fails to establish which "action under this section or other efforts to stop one more or more violations of this subchapter" she was retaliated against for pursuing. The court thus approaches its analysis under the assumption that Plaintiff attempted to further an action under section 3729, as most section 3730(h) opinions hinge on this section. She states that she visited the IRS and "reported the inappropriate

Civ. No. 11-1986 (GAG)

behavior of Face Bank in performing the electronic transaction from Venezuela in violation of [f]ederal [r]egulation[s]."  (Docket No. 65 at 4-5.)  The exhibits she cites, however, state as follows:

> Q: Did you discuss anything else with Mr. Arroyo that day?
>
> A: Mainly we spoke about the transaction activity in Venezuela that could help us understand the type of transaction that is taking place.  And the situation was that there are transactions that are performed in Venezuela that . . . are not allowed.  But there are regular transactions in Venezuela; that's why we required somebody to help us and to understand that even though they reside in Venezuela, but when opening the account in U.S. territory, there are transactions that cannot be made, even though they are regular transactions over there in Venezuela.
>
> Q:  Did you go to meet Mr. Arroyo at the IRS for the purpose of reporting any violation of the law or regulations by Face Bank or any of its employees?
>
> A: No.  I went there pertaining to offering of the seminar in order to provide guidance to the bank's employees.
>
> Q: Okay.  And when you actually met with Mr. Arroyo, did you provide him with any information regarding what you understood to be a possible violation of the law or regulations by Face Bank or any of its employees?
>
> A: No.   No.   I only went in order for him to help me provide the orientation to the employees, because my goal was for all of the employees to receive that guidance, and they – it was better for them to receive it through an agent because that would make things easier for them since they were directly, and it is a person that has knowledge in that specific area and can help us.

(Docket No. 65-3 at 1-2.)  Clearly, Plaintiff states she did not go to the IRS to report any violation of the law or regulations, and she did not provide it with any information regarding possible violations of the law or regulations.

As to the remaining eight facts, none of them demonstrate a false or fraudulent claim by Face Bank.  Perhaps they demonstrate Face Bank's failure to adhere to certain banking laws and reporting requirements, or that Plaintiff actively filed suspicious

**Civ. No. 11-1986 (GAG)**

activity reports, or that she provided files to auditors about putatively fraudulent transactions.  But the FCA prohibits the knowing submission of false or fraudulent claims to *the federal government*.  <u>Maturi v. McLaughlin Research Corp.</u>, 413 F.3d 166, 171-72 (1st Cir. 2005) (emphasis added).  Nothing in the claim or in the cited facts indicates that Face Bank made any claim whatsoever to the federal government.   This case is **DISMISSED**, with a reiteration that the BSA, Title VII, and PATRIOT Act claims were **DISMISSED without prejudice.**

## IV.      CONCLUSION

For the reasons stated above, the court **GRANTS** Defendant's motion for summary judgment at Docket No. 47.

It is **SO ORDERED** this 24th day of February, 2014.

<u>/s/ Gustavo A. Gelpi</u>
Hon. Gustavo A. Gelpi
United States District Judge

14